*In re* BIRDSONG.

*(District Court, S. D. Georgia.* June 29, 1889.)

1. JAILERS—CUSTODY OF UNITED STATES PRISONERS.
    For the purpose of safely keeping, properly caring for, and humanely treating prisoners committed to his custody by a court of the United States, a keeper of a county jail of a state, who receives such prisoners, and is paid for their maintenance, is an officer of the United States court.

2. SAME—PUNISHMENT OF PRISONER—CONTEMPT—JURISDICTION.
    As such officer of the court, to which he is immediately related, and as it affects United States prisoners so committed and received into his custody, the jailer may be punished by attachment for contempt for inflicting a cruel or unusual punishment on such prisoners.

3. SAME—CRUEL AND UNUSUAL PUNISHMENT—WHAT AMOUNTS TO.
    It is cruel and unusual as disciplinary punishment, and unwarranted by law, to chain a prisoner by the neck with a trace chain and padlock so that he can neither lie down nor sit down, and leave him so chained in darkness alone for several hours of the night; and it is the duty of the court by appropriate action to protect prisoners from such arbitrary oppression.

*(Syllabus by the Court.)*

At Law. Rule against the jailer of Bibb county jail, in custody of United States prisoner Joe Warren, for inflicting cruel and unauthorized punishment.

*Marion Erwin*, U. S. Atty., for the rule.
*Dessau & Bartlett, contra.*

SPEER, J. An investigation, which resulted in the issuance of the rule in this case, was made in consequence of a publication in a local paper reciting that a United States prisoner, Joe Warren, had been guilty of disorderly conduct in jail; that the jailer had called in policemen, and with their aid had inflicted disciplinary punishment upon the prisoner. The publication contained this clause:

"He [the prisoner] was chained by the neck to the grating of the cell, and by the time he stands up until this morning, and lives a day or two on bread and water, he will probably be willing to be disciplined."

Unwilling that a statement so suggestive of cruelty in the punishment of a prisoner, so repugnant to the well-ordered methods of discipline, tempered with humanity, which characterize the treatment of prisoners in this day of Christian civilization, should escape investigation, the court did not doubt its duty to direct an immediate inquiry into the occurrence thus brought to its attention. The investigation was at once

made by the marshal; and the facts developed, in the opinion of the court, required that the jailer should be ordered to show justifying cause,. if he could, why, on the night of June 25, 1889, in Bibb county jail,. he chained up by the neck to the grating of his cell for several hours the United States prisoner; the punishment appearing to be cruel and un- usual, in violation of the prisoner's constitutional rights, and without law- ful authority. The respondent demurred to the rule for the alleged rea- son that the court had no jurisdiction to require the jailer, an officer of the state, to answer for any misconduct towards a prisoner committed to his custody by the United States court. It was vehemently urged that the jailer was not an officer of the United States, and that he had no rela- tion to the court which would warrant an attachment for official miscon- duct. These propositions are, in the opinion of the court, not supported by the law. They are settled adversely to the respondent by distinct and most eminent authority. Mr. Justice STORY, pronouncing the de- cision of the supreme court of the United States in the case of *Randolph* v. *Donaldson*, 9 Cranch, 86, announces the obvious rule upon this sub- ject as follows:

"For certain purposes, and for certain intents, the state jail lawfully used by the United States may be deemed to be the jail of the United States, and the keeper [*i. e.*, the jailer] to be the keeper of the United States."

Is it a lawful use to commit the prisoners of the United States to the state jail? Undoubtedly, for the Code of Georgia, § 359, so declares. Then the jail of Bibb county, Ga., is lawfully a jail of the United States, and the jailer, Nat Birdsong, is the jailer of the United States for the purpose of receiving, keeping, and properly treating prisoners of the United States; and it may be remarked that the services which the re- spondent renders his country in behalf of its prisoners are by no means gratuitous. It is then clearly apparent that, as to United States pris- oners committed to his custody, by the order and sentence of this court, commanded as he is, to receive them by the law of Georgia and of the United States, and paid, as he is, for these services, the respondent is a jailer of the United States. Now, can it be pretended that the court is powerless to compel the jailer to the performance of his duty, or to prevent or punish its non-performance in the presence of this important relation to the administration of justice imposed by law?

The arbitrary power in a prison-keeper to iron a prisoner, or indeed, to select at his pleasure a penalty which he thinks adequate as a discip- linary measure for real or fancied misconduct, is intolerable among a free and enlightened people. It has no place among English-speaking nations. It is as repugnant, as we shall presently see, to the law of Georgia, as to the laws of the United States. It is as worthy of condem- nation in the light of the state and the federal constitution, as in the be- nignant and merciful spirit of Christian civilization. Not even may a judge or jury assume a power so uncertain and so dangerous. "It is one of the glories of our English law," writes Mr. Justice Blackstone in his luminous and graceful Commentaries, "that the species, though not always the quantity or degree of punishment, is ascertained for every of-

fense, and that it is not left in the breast of any judge, nor even a jury, to alter that judgment which the law has beforehand ordained for every subject alike without respect of persons." 4 Bl. Comm. 377. The word "subject" is here used in the sense of "citizen." This principle of the common law is of force in this country as in England, and thus we see that neither this court, nor, indeed, the highest court in the land, would assume, even after full hearing, to exercise the power to chain up by the neck a prisoner for disorderly conduct, even the most atrocious, and even though committed in the actual presence of the court. Had any judge of America done with the most degraded convict what this jailer admits he did with the person of this prisoner, his impeachment would be inevitable. Well, may a jailer arrogate to himself powers which are withheld from the courts? Is it competent for the jailer in his discretion to inflict penalties and to exercise arbitrary powers which are not deemed safe or appropriate to be intrusted to the judges? The proposition is unworthy of any intelligent mind trained in the letter or the philosophy of the law. But we are not left in the determination of this question to the consideration of those great fundamental principles announced for the protection of the individual against unlawful punishments and penalties. The authorities are equally clear in their denial of the power exercised by the jailer with this prisoner. At common law it was not lawful to hamper a prisoner with irons, except to prevent an escape. "Otherwise," it is declared, (1 Russ. Crimes, 420,) "notwithstanding the common practice of jailers, it seems unwarrantable and contrary to the mildness and humanity of the laws of England by which jailers are forbid to put their prisoners to any pain or torment." Sir Edward Coke, perhaps the most erudite of English lawyers, certainly profoundly versed beyond any in the principles of the common law, although noted for his harshness and severity to prisoners, declared that "by the common law it might not be done." 2 Inst. 381. In consonance with the spirit of the ancient law, the statute of 4 Geo. IV., c. 64, § 10, subsec. 12, provides that no prisoner shall be put in irons by the keeper of any prison except in case of urgent and absolute necessity. 4 Bac. Abr. 479; Encyclopædia Britannica, tit. "Prison Discipline." And by the same act the jailer was provided power to punish prisoners for disorderly conduct, and for profane cursing and swearing; but the broad intelligence and humane spirit of parliament limited the maximum penalties for such conduct to close confinement in the refractory or solitary cells, and a diet of bread and water only, for any term not exceeding three days.

Let us see if there is not a cogent legislative interpretation of the jailer's duty with reference to profane or refractory prisoners, made by the general assembly of the state of Georgia. By the Georgia enactment of December 19, 1816, to define the disciplinary powers of the keeper of the penitentiary of that day, the feature of 4 Geo. IV., above quoted, was adopted *ipsissimis verbis*. But where the English penalty for profanity, etc., was three days, the Georgia statute was limited to two days, thus mitigating by the merciful spirit of our fathers the already

clement provision of the English statute; and, if this is adequate punishment for felons convicted and serving their sentences in the penitentiary, is it not sufficient to compel good behavior in those prisoners who are simply committed for safe keeping? But to chain a prisoner around the neck with a trace chain and padlock, in a position where he can neither lie down nor sit down, and thus to leave him chained in solitude, in the night, in the darkness of his cell, for more than three hours, is to inflict a degree of torture which has no warrant in the law, either state or federal, and to expose him to danger to health and to life, from which it is the duty of society to protect him. The evidence offered on the hearing can lead to no other conclusion. The prisoner, Warren, testified that he was kicked by the jailer, and struck with the club by the policeman, and chained by the neck so that he could not put his heels to the ground from 8:30 o'clock until after 3 the next morning; that he suffered severely, and next day was compelled to send for the jail physician. Dr. Gibson testified that such treatment would likely produce fever in the sufferer. Dr. Johnson, the jail physician, testified that when the prisoner sent for him he had fever, but he thought it was catarrhal fever. But the court, in the conflict of the evidence, did not credit the statement of the prisoner. Nevertheless, by the testimony of Birdsong himself, the prisoner was chained so that he must stand for two and one-half hours; and by the testimony of Brown, the policeman, he must have been chained for more than three hours; at best, an ignominious, cruel, and unusual punishment. Besides, both physicians testified that such punishment might have resulted in dangerous, or even fatal, consequences; and it is clear to any unprejudiced mind, that had the prisoner swooned,—a natural result of such inhumanity,—his death from strangulation would have been inevitable. It was, in fact, punishment by the pillory, but a pillory where the links of the trace chain and the padlock encircling the bare neck of the prisoner were substituted for the wooden frame. This punishment was abolished in England in 1837. 7 Wm. IV., and 1 Vict. c. 23. It was done away with in France in 1832, and in this land of humanity and lawful methods it was forbidden by the act of congress of February 28, 1839, (5 St. at Large, 322;) and yet the jailer testified that this was his usual method for the punishment of refractory prisoners,—a method which called imperatively for the ruling of the court declaring it illegal.

But it is insisted that the court may not proceed by attachment against the jailer; that the remedy is by indictment. This proposition is likewise altogether unfounded in the law. In 2 Hawk. P. C. c. 22, § 31, the rule is stated as follows: "Also jailers are punishable by attachment, as all other officers are by the courts to which they more immediately belong, for any gross misbehavior in their offices." 4 Bac. Abr. 471. This principle is embodied in the law of the state. Code Ga. § 4711; also section 206, par. 4. The power of the court to proceed by attachment is thus made clearly to appear, by the common law and the statutes of the state; and the Revised Statutes on this topic are in substantially the same language as the Georgia Code. But it is insisted that the United

States prisoners in the jail of the state, by virtue of section 359 of the Code, are "under like penalties, and subject to the same action, as prisoners committed under the authority of the state." This we concede entirely. We declare, however, that there is not, nor has there been at any time in the history of the state, any law of any character which will justify or condone the act of chaining for hours a prisoner by the neck, in a standing position, as a means of punishment for any offense whatever. Nor is the testimony of the jailer, and statement urged in argument, that the grand juries and county commissioners of Bibb county approve this punishment, satisfactory. It does not appear that this practice was ever brought to the attention of the grand jury. Nor was any order or judgment of the county commissioners to such effect put in evidence. But if, as the jailer and his counsel insist, such was the action of these bodies, it was without warrant of law, and this is happily a government of law.

Much has been said as to the character of the individual who was punished. This is not a question of individuals. If the jailer is intrusted with arbitrary power to chain prisoners in a standing position to punish them, what guaranty is there that he will not misuse it? Hundreds of citizens of this state are yearly consigned by the United States courts to the custody of this and other jailers for offenses which are *mala prohibita* simply. If the jailer is judge, jury, and executioner, can it be predicted with certainty what will be the character or color of the next victim of the chain and padlock? It is a rule we are considering,—a rule for the protection of the unfortunate as well as of the vicious. The constitution forbids a cruel or unusual punishment, and there is no syllable relative to the character or color of the victim in that matchless charter for the preservation of right and the prohibition of wrong. In consideration of the premises, and to emphasize its judgment that an unwarrantable and illegal punishment has been inflicted on this prisoner, and to protect this and other prisoners, the court assesses a penalty of $50, with costs, against the jailer. In the anticipation, however, that this first offense will not be repeated, the court will not enforce payment by the respondent, but will suspend the sentence until further order.