**Ex parte PICKENS.**

No. A–7309.

United States District Court Territory of Alaska. Third Division.

Nov. 30, 1951.

Stanley J. McCutcheon, Anchorage, Alaska, for petitioner.

Wendell P. Kay, Peter J. Kalamarides, James E. Swan, Roger Cremo, Anchorage, Alaska, John Rader, amici curiae.

James E. Swan, Roger Cremo, John L. Rader, Anchorage, Alaska, amici curiae.

DIMOND, District Judge.

In his petition the petitioner alleges that he is being imprisoned, detained and restrained of his liberty by Walter E. Huntley, United States Marshal for the Third Division, District of Alaska, in the United States jail in the City of Anchorage, Alaska, under conditions described in detail in the petition, which are asserted to constitute cruel and inhuman punishment in violation of the Eighth Amendment to the Constitution of the United States.

Upon the filing of the petition an order was made for the issuance of the writ. The Marshal returned the writ and brought the petitioner into court. Witnesses were sworn and examined on the part of the petitioner and at the conclusion of the hearing decision was reserved.

The technical legality of the detention of the petitioner is not challenged. He was arrested upon proper process, held to answer, had the aid of counsel, waived indictment and thereupon the United States Attorney filed an information charging him with the crime of robbery. The papers are all in order and there is not even a suggestion of error or of oppression.

The imprisonment is said to be in violation of the Eighth Amendment of the Constitution, which forbids cruel and inhuman punishment, and is therefore illegal. Not only the averments of the petition and the affidavits in support thereof, but the oral testimony given on the hearing indicates conditions of imprisonment which may, perhaps, be classed by some as cruel and inhuman punishment. The jail structure itself is an ancient frame building which has long outlived its usefulness. The 40 prisoners who were held at the time of the hearing are crowded together in a room about 27 feet square, most of the floor space being occupied by bunks tiered up along the walls and by tables and benches. There is no place for the prisoners to move about and no recreational facilities whatever are afforded. Youths of 16 are herded together with hardened criminals. Even those who are "mental cases", unless violent, are confined in the same room. The men thus confined must stay there, until discharged, under conditions that may well be calculated to impair if not to break the morale of any but the strongest by reason of the crowding and lack of adequate ventilation and the hazard of fire.

No complaint is made of the treatment afforded the prisoners by those having them in charge. The food is reported to be satisfactory and the guards humane. The averment of cruel and inhuman treatment arises from conditions over which the United States Marshal and his deputies have no control. The jail physician has made an affidavit as to the unsanitary conditions of the jail resulting from crowding and lack of ventilation and lack of adequate bathing and toilet facilities and the danger of spread of contagious diseases. Testimony shows that there is only one shower bath for the use of the prisoners and only one toilet bowl. Sometimes the sewage outlets are clogged because they are as dilapidated as the rest of the structure.

But the feature of the imprisonment which in some of its aspects comes most closely to constituting cruel and inhuman treatment, lies in the ever present possibility of fire. The room where the prisoners are confined is heated by a coal stove of ancient type, bulging in the middle, tapering above and below, with flares at top and bottom. During the daylight hours the very number of the prisoners would probably in itself guarantee that the fire would not spread because it would be stamped out immediately, but at night when

most of the men are asleep, or endeavoring to sleep, on the floor, on the tables, in the bunks and on the benches, a fire might conceivably get beyond control rapidly. There is always the chance that among the prisoners is one so unstable in mind, or so wicked, as to deliberately start a fire regardless of personal danger. Local records indicate the jail and courthouse in this division, then located at Valdez, were completely destroyed by fire from such an act of a prisoner. The only exit is into and through the adjoining kitchen and the door between the kitchen and the prison itself is necessarily kept locked to prevent the escape of prisoners. Nor is there any other exit, or place that could be made an emergency exit without danger of facilitating such escape. Altogether, the place is not fit for human habitation and to crowd into this room so many prisoners at once well justifies the comment of representatives of the health service of the Federal Government who referred to it as a "fabulous obscenity".

Another feature that should not be overlooked is the insufficiency of sleeping accommodations, although that alone is not so important. There are altogether fewer than 20 bunks to accommodate the 40 prisoners and accordingly they are required to sleep in shifts. At night, when most of them prefer to sleep, they not only fill the bunks but lie down on the floor, on the one table and on the benches.

Repeated efforts have been made by the local authorities and by the citizens generally over the years to secure funds for the construction of an adequate jail. At one time an appropriation bill passed the House of Representatives and died in the Senate. Lately a bill passed the Senate and the House at first rejected it. Finally, a compromise was made for an appropriation of $400,000, but even that appropriation was made in such form that it is not presently available and may never be made so. To the appropriation was appended a provision that none of the funds shall be obligated "until final plans for construction of the federal jail at Anchorage, Alaska, within the funds allowed, have been approved by the Appropriations Committees of both Houses of Congress". One can well be apprehensive lest the approval of the plans by the Appropriations Committees of both Houses of Congress may be so long deferred to such a distant date that the appropriation will lapse and thus be never available.

At the hearing in this proceeding it was disclosed that as to the other federal jails in the Third Judicial Division, the one at Kodiak, Alaska, some 300 air miles distant from Anchorage, has a capacity of 36 prisoners; the one at Seward, 114 miles distant by rail, 30; the one at Cordova, 125 air miles distant, 20; the one at Dillingham, 400 air miles distant, five. It appears that the Seward jail is kept filled constantly by the overflow from Anchorage, that the one at Cordova is fairly well occupied in taking care of those confined locally; the one at Kodiak is so far distant that the expense of carrying prisoners and their guards from Anchorage to Kodiak and return is considerable. Some unused space was available in the Kodiak jail at the time of the hearing.

Nearly all criminal cases are tried at Anchorage and most of the attorneys reside at Anchorage. Accordingly, in order to give the prisoners opportuntiy to consult their attorneys it is highly desirable that they be detained at Anchorage until after trial, when, if convicted, they may be removed to other jails, or if convicted of felonies, to a United States penitentiary in the States.

Of the 40 prisoners confined on the day of the hearing, all but four were being held for trial. Those four were serving such short sentences that it was not considered expedient to remove them to any other jail in the Third Division. Of the 36 awaiting trial the following is a list of the offenses charged against them either by indictment or by information—nearly all by indictment of the Grand Jury:

| | |
|---|---|
| Robbery | 11 |
| Larceny | 3 |
| Burglary | 2 |
| Assault with Intent to Commit Robbery | 1 |
| Attempted Robbery | 1 |
| Embezzlement by Employee | 1 |

288

Contributing to Delinquency of a Minor 3
White Slavery 3
Rape 1
Assault with a Dangerous Weapon 2
Manslaughter 1
First Degree Murder 1
Resisting & Assaulting a Federal Officer 1
Possession Narcotics 2
Forgery 1
Traffic Violation 1
Yet to be arraigned in Commissioners Court 1

 The facts being established, the next question is what ought to be done and what can be done to remedy the existing conditions. That the "cruel and unusual punishment" referred to in the Eighth Amendment is to be considered in the light of developing civilization is indicated in the case of Weems v. U. S., 1910, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793. It is, therefore, not necessary to speculate as to what might have been considered cruel and inhuman punishment in 1787. Reason, if not authority, indicates that the protection of the Eighth Amendment extends not only to those convicted but to those held for trial. Cf. In re Birdsong, D.C.S.D.Ga.1889, 39 F. 599, 4 L.R.A. 628. In several of the cases brought to the attention of the Court, for example, Stuart v. Board of Supervisors, 1876, 83 Ill. 341, 25 Am.Rep. 397, and Howard v. State of Arizona, 1925, 28 Ariz. 433, 237 P. 203, 40 A.L.R. 1275, the applications for relief from cruel and inhuman punishment was not sought in habeas corpus but in some other form of action.

In several instances habeas corpus has been used to secure the petitioner the right of counsel guaranteed by the Constitution, Ex parte Rider, 1920, 50 Cal.App. 797, 195 P. 965; Ex parte Snyder, 1923, 62 Cal.App. 697, 217 P. 777. In Ex parte Terrill, 1930, 47 Okl.Cr. 92, 287 P. 753, the petition was based upon an averment of "cruel and unusual punishment"; but in none of the cases was the petitioner discharged by reason of deprivation of his constitutional right. These rulings were placed upon the grounds that the petitioners had not exhausted other possibilities of relief, as in the Ellis case, or because the Court could and did grant other adequate relief, as in the Rider and Snyder cases. In the Rider case, supra, we find on page 966 of 195 P. in the second column the following language: "We think that a person may be said to be unlawfully 'restrained of his liberty,' so as to be entitled to the writ of habeas corpus, when, though lawfully in custody, he is deprived of some right to which, even in his confinement, he is lawfully entitled under the Constitution or laws of this state or the United States, the deprivation whereof serves to make his imprisonment more onerous than the law allows, or curtails, to a greater extent than the law permits even in his confinement, his freedom to go when and where he likes."

And in the Terrill case, supra, the Court remarked: "Habeas corpus is a collateral remedy, and is subject to the limitations common to collateral proceedings. The legal remedies provided by law should, as a general rule, be exhausted or denied before habeas corpus may be resorted to. We find no authorities directly in point upon the question raised in this case, but some of the cases incidentally or indirectly bear out the contention that, where a prisoner held by valid process is incarcerated in some place other than that provided by the judgment or a place not authorized by law, or where the punishment is different in kind from that provided by the judgment, the prisoner may be discharged or the court may require that the confinement be in the proper place or that the punishment be as imposed by the judgment, or such order may be made as justice requires. 29 C.J. 173, § 195; In re Johnson (C.C.) 46 F. 477; Com. v. Francies, 250 Pa. 350, 95 A. 798; Weems v. U. S., 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann.Cas. 705; In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835."

No instance has been found in positive legislative enactment or in the reported opinions of the discharge of the prisoner because he was held in violation of the constitutional provisions concerning right of counsel or concerning cruel and inhuman punishment. As indicated above, two divisions of the District Court of Appeals in California and the Supreme Court of

Oklahoma have said, or indicated, in substance, that there may be circumstances so galling and oppressive, and in which any other relief can not be granted, that the petitioner may be discharged.

Under provisions of the State Constitution identical with the relevant clause in the Eighth Amendment, the Supreme Court of Kansas in a habeas corpus proceeding refused to discharge the petitioner from a jail that was described by State authorities as "a dark, filthy, disease-breeding dungeon for its inmates, and a disgrace upon a prosperous and enlightened community." In re Ellis, 1907, 76 Kan. 368, 91 P. 81, 82.

Here we are faced with a circumstance that the discharge of the petitioner in this case is almost certain to result in the filing of some 39 other similar petitions by men accused of crime running the gamut from murder to traffic violations, but most of them of grave nature. It will be noted that a substantial number of those detained have been indicted for the crime of robbery and another but less number for white slavery. Although the presumption of innocence must be given full force and effect, experience teaches us that a very high percentage of those accused of crime by the Grand Jury are ultimately convicted and sentenced accordingly. It is common knowledge that many people in the City of Anchorage and vicinity go about at night fearfully, and understandably so. A release of some dozens of persons who have already been indicted for crime will not add to the feeling of safety which every citizen ought to be able to enjoy.

If relief could be had in this proceeding by commanding the Marshal to furnish other quarters for the prisoners the solution would be easy. But the Marshal has no funds with which to build or construct or lease or otherwise obtain any prison more suitable or more safe for those confined. Congress, quite rightly, has been careful to denounce as a felony the expenditure of money by an executive officer beyond that appropriated. The Attorney General is not and probably can not be made a party to this proceeding. Those who are responsible for the present condition, the members of the two Houses of the Congress of the United States, are not subject to the jurisdiction of this Court.

■ The writ of habeas corpus is primarily designed to prevent unlawful imprisonment, and that has been almost universally thought of as referring to the provisions of law under which persons are prosecuted for crime or are otherwise restrained of their liberty.

The question is asked as to the type of remedy that is available in such cases to relieve a prisoner from punishment said to be cruel and inhuman. In the States the solution is usually not difficult because jurisdiction can be had of the authorities who have charge of the imprisonment and they can be commanded to change the type of restraint. No such facile method of proceeding is available here and consequently we are faced with the alternative as to whether the writ of habeas corpus will lie, and this petitioner and the other prisoners in the Anchorage jail discharged.

The phrase "cruel and inhuman punishment" is obviously a relative term. Not only the four quoted words incorporated in the Eighth Amendment, but the illumination that is cast upon those words by all relevant circumstances, must be considered. To some persons, any imprisonment is "cruel and inhuman". After all, the "cruel and inhuman punishment" suffered by the petitioner and others in the Anchorage jail, although rightly to be deplored and condemned by all people with humane instincts, is scarcely deserving of the name when compared with the danger and misery and "cruel and inhuman" circumstances under which our own soldiers and other troops of the United Nations now in action in Korea live—and die—where they are now not only compelled to lie or move about in the mud and slush and snow and frost for hours or even days on end, to undertake physical effort to the point of exhaustion, but exposed to the hazards of being shot and bombed, killed or maimed, by a savage and remorseless enemy, or being listed as "missing" and thus consigned to a fate that probably is death or worse than death itself. The question may well be asked why men in Anchorage, Alaska, accused of serious crime, even when im-

prisoned under the conditions described, should be now discharged from imprisonment with the risk that never again can they be brought to trial, when others of our citizens, thousands in number, who are not even accused of committing any crime but are engaged in the defense of all of the people of our nation—including those now confined in the Anchorage jail—are, by mandate of law, as well as from patriotic spirit, undergoing hazards a thousand times as great and suffering "cruel and inhuman punishment" far more terrible than that to which the petitioner and his fellow prisoners in the Anchorage jail are exposed. Dangerous as such a comparison may be, it is not to be abruptly excluded, remembering that the term involved is not capable of precise definition, universally applicable, and considering also serious alternatives between which this Court must now choose.

If, as written by one of the most eminent, the life of the law has been not in logic but in experience, the punishment now suffered by the petitioner, while inexcusable and shocking to the sensibilities of all civilized persons, is not of such nature as to come presently within the scope of the Eighth Amendment and to justify discharge of the petitioner at this time.

The petition is denied.