James RHEM, Robert Freely, Leo Robinson and Eugene Nixon, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

George F. McGRATH, Commissioner of Correction for the City of New York, Arthur Singerman, Warden, Manhattan House of Detention for Men, John V. Lindsay, Mayor, City of New York, Paul McGinnis, Commissioner of Correction of the State of New York, and Nelson A. Rockefeller, Governor, State of New York, Harold A. Stevens, Presiding Justice, New York State Supreme Court, Appellate Division, First Department, individually and in their official capacities, Defendants.

No. 70 Civ. 3962.

United States District Court,
S. D. New York.

March 17, 1971.

Edward Q. Carr, Jr., William E. Hellerstein, Barbara A. Shapiro, Joel Berger, Legal Aid Society, New York City, for plaintiffs; Donald H. Zuckerman, New York City, of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for defendants McGrath, Lindsay and Singerman; James Nespole, and Leonard Bernikow, New York City, of counsel.

MANSFIELD, District Judge.

In this suit brought under the federal Civil Rights Law, 42 U.S.C. § 1983, plaintiffs seek relief for a class consisting of all the inmates now confined in the Manhattan House of Detention for Men, commonly known as "the Tombs." Plaintiffs allege that the conditions under which they are presently confined constitute cruel and unusual punishment in violation of the Eighth Amendment, that the practice of opening and inspecting inmates' incoming mail is an infringement on their constitutional right to communicate freely with their attorneys, and that the absence of readily-accessible rules and regulations governing the conduct of inmates and correction officers in the Tombs deprives them of due process of law under the Fourteenth Amendment.

Plaintiffs moved earlier for a determination that the action was maintainable as a class action. Defendants did not oppose that motion, and on October 26, 1970, Judge McLean found that the action was maintainable as a class action for all the inmates of the Tombs. Plaintiffs now seek preliminary injunctive relief under Rule 65, F.R.Civ.P., pending final hearing and determination of the action.[1] Defendants, those repre-

---

1. More specifically plaintiffs seek an order restraining defendants from:

"1. Imposing twenty-four hour a day 'lock-up' for inmates of the Tombs, except in an emergency, and then only for the duration of the actual emergency.

"2. Denying inmates of the Tombs showers, access to the prison commissary, religious services, regular notarial services, regular 'sick call,' regular

sented by the New York Corporation Counsel, have moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, Rule 12(b) (1) and (6), F.R.C.P.

Our jurisdiction over § 1983 claims asserted by state prisoners is clear, Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970). We deferred decision upon the motion for a preliminary injunction in light of defendants' representations that the conditions complained of were temporary, due to events beyond defendants' immediate control, and would be remedied with all due speed. Having examined the facts of the case as they appear from the affidavits, including supplemental affidavits submitted since plaintiffs' motion was initially made, and submitted upon defendants' more recent motion to dismiss, plaintiffs' motion for a preliminary injunction is granted in part and denied in part, for reasons discussed in more detail below.

The Tombs is a house of detention, or jail, located at 140 Centre Street, New York City. It is employed as a short-term facility for housing men awaiting trial in New York Supreme Court who have not been admitted to bail (the largest class of inmates), men who have been convicted and who are awaiting sentencing, men serving sentences elsewhere whose presence in New York City is required for coram nobis and habeas corpus hearings or for trials at which they are to be witnesses, and some men serving sentences who have been assigned to provide institutional help. The Tombs is under the jurisdiction of the Commissioner of Correction ("the Commissioner"), defendant McGrath, a New York City official.

In recent years, over-crowding and trial delays have led to severe discontent and stress among the inmates of the Tombs.[2] On August 10 and 11, and August 20, 1970, these factors boiled over into inmate disturbances. The inmates protested against the privations of their incarceration, created a general state of disorder and inflicted substantial property damage. After the Commissioner had restored control, the inmates instituted this action challenging the allegedly worsened conditions at the Tombs. Then, on October 2, 3, and 4, 1970, new disturbances broke out on a scale much larger than those of August. Rioting in the Tombs was part of a city-

meals, access to the library and legal materials and regular family visiting privileges.

"3. Interference or neglect which results in any inmates missing or being late for a scheduled court appearance.

"4. Reading or censoring correspondence of inmates with their attorneys.

"5. Increasing the population of the Tombs.

"6. Failing to post or distribute rules and regulations governing inmates and guards in both English and Spanish.

"7. Moving any of the named plaintiffs in this action, or any proposed witnesses, a list of which shall be given to defendants, and to which names may be added at any time, outside the jurisdiction of this Court, unless defendants LINDSAY, McGRATH, and the WARDEN of the Tombs agree to return any such inmate to the jurisdiction at least 10 days prior to any scheduled eviden-

tiary hearing or trial in this action * * *." (Motion for Preliminary Injunction dated Oct. 16, 1970, pp. 1–2)

2. Suicide by inmates has become a tragic symptom of this malaise, especially at the Tombs. A particularly moving account of the case of Raymond Lavon has been furnished to the court as an exhibit. In his most recent affidavit, the Commissioner indicates that the New York City Department of Correction has requested and is cooperating fully with an application being made by the Division of Psychiatry of the Cornell Medical School for funding, by the National Institution of Mental Health, of a study of suicide in New York correctional institutions. The Correction Department has also conducted a series of seminars designed to alert correction personnel of the problem of suicide and means for coping with it.

wide outbreak which saw disruption at a total of five institutions [3] and the taking of 32 hostages. The October disruption caused a considerable amount of further property damage to the Tombs,[4] but no loss of life or serious injury to inmates or correction personnel.

After the termination of these disorders, the conditions under which inmates of the Tombs are incarcerated worsened. There is little dispute between the parties as to the general outlines of these conditions. At first, inmates were confined in a 24-hour "lock-in," not being permitted to leave their cells at any time. The inmates claim that they were denied such basic elements of cleanliness as showers and shaves. They were also denied religious counselling, the chapel having been extensively damaged, and notarial services, due to lack of the usual number of correction officers assigned to function as notaries, following the disorders. Sick calls and medical services were allegedly either non-existent or inadequate; meals were occasionally cold when served, and sandwiches sometimes were substituted for the normal dinner menu. As no tables or chairs were available (because they had been destroyed or damaged beyond repair in the uprising), inmates were required to eat in their cells, on beds or on the floor. Initially no library facilities, including law books and other legal materials, were available (the library and books having suffered severe

damage and its correction officer, who had been held as a hostage, not having returned after the disorders). Family visiting privileges were suspended or curtailed and some inmates were not taken to court appearances on time. Moreover, with the imposition of a 24-hour lock-in there was an absence of any physical exercise beyond what could be obtained within the confines of the ordinary cell.

Also alleged as part of the overall scene, but not attributed to the disturbances, were the censorship of mail and the absence of any publicly-posted set of rules and regulations governing the conduct of inmates. In addition to these grievances, the Tombs continued to be overcrowded, albeit to a lesser degree than that prevailing prior to the disturbances.

The foregoing general picture, plaintiffs maintain, amounts to cruel and unusual punishment in violation of the Eighth Amendment. The conditions of which they complain can be mainly attributed either to tightened security measures adopted in efforts to prevent a third outbreak of inmate violence or to the lack of physical facilities that were destroyed during the disturbances. The central element in the policy of tightened security was the 24-hour "lock-in," which was initially imposed, and the limited period of "lock-out" time, i. e., time allowed outside of their cells, which the inmates are now granted. Prior

---

3. For a similar civil rights action arising from simultaneous inmate disturbances at the Queens House of Detention for Men, see Valvano v. McGrath, 325 F.Supp. 408 (E.D.N.Y., orders filed Dec. 8, 1970 and Feb. 1, 1971).

4. "During the riots, the inmates caused considerable damage to the institution. Present estimates run between $450,000 to $500,000. They destroyed furniture, such as chairs, desks, benches from the chapel, lockers in the Captain's locker room, medical cabinets and furnishings in the pharmacy. They also ruined hundreds of books, magazines, files, etc. They destroyed religious articles, priests' vestments, crucifixes and statues. They cut uniforms in the lockers with knives and stole personal belongings of the correction officers. Typewriters were smashed. The motion picture projection equipment was damaged as was the television set in the library. Large quantities of drugs and pills were either consumed unlawfully or bottles smashed and contents ruined. All band instruments, including the chaptel's [sic] organ and piano were destroyed. Holes in various walls were made, grills and tiles were ripped from their setting. The floors were flooded and in some instances made slick by a compound of oil and detergents from the sanitation closets." (McGrath Aff. dated Oct. 30, 1970, p. 2, n. 1)

to the disturbances inmates were locked out of their cells much of the day, with three to four correction officers supervising an entire floor of approximately 200 inmates. Inmates went from their own floor to other parts of the building, such as the commissary, the library, the chapel, and the clinic. It is not clear whether they went under an institution-wide schedule and whether they were accompanied by guards, but they did have a greater degree of freedom of movement than at present, and consequently a bit more of a chance to obtain physical exercise. Such a system could not function without either some minimal trust between inmates and guards, or a total fear of guards by the inmates, neither of which appears to exist at present. As a result of the disturbances, extensive periods of lock-in were imposed. The lock-in substantially affected the availability and ease of obtaining showers, commissary privileges, notarial, medical and religious services.

The damage caused by the inmates and the absence of certain guards who were taken hostage during the disturbances account for a large part of plaintiffs' remaining grievances. For example, heavy damage was caused in the chapel, preventing its utilization until December 13, 1970. Notarial services have been reduced because, with the staff of seven prison guards who were authorized· to function as commissioners of deeds reduced to six by illness, still another guard was taken hostage in October and had not returned to duty as of October 30, 1970. Meal services were affected because the tables, chairs, and benches which had been located adjacent to the cells and on which the inmates had formerly dined, were destroyed during the disturbances. Damages done to the library, including the destruction of law books, have made necessary a curtailment of library use. Moreover, the guard who was a trained librarian was held hostage and had not returned to duty at the end of October. (We have not been advised as to whether he has since returned.)

The prison conditions complained of might raise federal constitutional issues if imposed, or if permitted to continue as standing policy, by an indifferent, neglectful, or vengeful prison administration. The record before us, however, reveals that in the present case the Department of Correction has been making good faith efforts to restore conditions in the Tombs to their state prior to the disturbance and in the meantime to continue providing services despite the destruction of physical facilities. It further·appears that as a result of the uprisings efforts are being made to alleviate some of the conditions that may have contributed materially to the disorders, with the Board of Correction conducting investigations and publishing reports (e. g., December 3, 1970 release by W. J. vanden Heuvel, Chairman, regarding suicide of Raymond Lavon in the Tombs), the New York courts speeding up the processing of cases of Tombs' inmates, and the Department of Corrections transferring some inmates to other institutions in order to reduce the inmate population at the Tombs.

The result of these efforts has been that as time has passed security measures have been relaxed. As of October 30, inmates were permitted to be locked out of their cells on a controlled basis, with·different floors being locked out at different times. Predictions made then that lock-out time would expand, depending upon the mood and receptiveness of the inmates, have proved accurate. Each inmate is now released from his cell during each of six days a week, including evenings. Although release of all the inmates on a given floor at one time has not been attempted because of the absence of protective screening on the observation galleries, one-half of each floor is locked out during each lock-out period under current procedures. Lock-out hours are 9:00–11:00 A.M., 1:00–3:00 and 6:30–8:00 P.M., except Sundays. There is no lock-out on Wednesday evenings to facilitate attorney visits, which have been extended to Wednesdays between 4:00 and 7:00 P.M.

As for showers, we are informed that each inmate may shower once every 48 hours, and the warden of the Tombs has been instructed to certify to the Commissioner the number of inmates who have been able to shower on each floor. (Some prisoners have refused to use shower facilities when they are available.) Two sentenced inmates serve as barbers for inmates who are awaiting trial; one is available for sentenced inmates. A program is in the planning, for which equipment has been purchased, to permit inmates awaiting trial to give each other haircuts with electric clippers. Shaves are available for inmates who desire them.

Before the August riot inmates were allowed personally to visit the commissary and select their purchases. The commissary was almost completely destroyed in the August uprising, however. Commissary privileges are now permitted to each inmate twice a week, with $5 of purchases being permitted on each occasion, or $10 per week total (monies which the inmate must have in his commissary account). Due to the unsettled circumstances, inmates are not permitted to go to the commissary themselves, but are instead required to make out a commissary order blank, which is filled on the day after it is submitted. Inmates are given a toothbrush, toothpaste, and comb upon admission, and additional supplies of these items are provided on each housing floor for distribution to indigent inmates. All inmates are provided with soap, towels and bedding.

The correction authorities have ordered the following clothing in various sizes for inmates in need of clothing: 250 pairs of pants, 250 lumber jackets, and 21 dozen shirts.

Although the chapel was seriously damaged, members of the clergy assigned to the Tombs were permitted to visit inmates in their cells to provide religious counseling and pastoral guidance. For other clergymen wishing to see inmates, the inmate was brought down to the counsel room. Moreover, group religious services in the chapel have now been resumed under a system of strict security.[5] At the invitation of the Department of Correction, both English and Spanish churches and clergy have begun working with the institutional chaplains, collecting books, money and clothing, to assist inmates from their areas. A church workshop at Trinity Church in Manhattan has been scheduled for March 25, 1971. Approximately 100 clergymen are expected to attend this meeting, which is intended to involve these clergymen in working with the institutional chaplains. With regard to notarial services, due to the handicaps of reduced staff and prisoner mobility as described above, a notary (i. e., a correction officer who is also a Commissioner of Deeds) is available on each floor at least once a week. In an emergency a notary, upon an inmate's request, will go to his cell to perform notarial services. "These officers are instructed to make every effort to accommodate inmates in need of their services."[6] A mobile library is used to

5. "Repairs have been made in the chapel to the extent that it now can be used by inmates desiring to worship there. On Sunday, December 13, 1970, Christian Science services were held in the chapel. Hebrew services have also been held in the chapel. Institutional Orders Nos. 41 and 43 concerning religious services, copies of which are annexed as Exhibit 'C', have been issued. However, the clergy has not availed themselves of such schedule and the procedure for such religious services enunciated therein. Religious services will be held on Thursday, December 24, 1970, for Catholic inmates. The Protestant and Catholic clergy are discussing the feasibility of conducting religious services on weekdays during the 8:00 A.M. to 4:00 P.M. tour. Certain inmates have requested that Rev. Louis Farrakham, a minister of the Muslim faith, visit them for religious conseling [sic] or pastoral guidance. I have informed them to write him and they advised me they have done so. To date, Rev. Farrakham has not contacted the institution. Upon contacting the institution, permission would be granted for interviews with inmates who requested to see him." (Batterman aff. dated Dec. 16, 1970, ¶ 6)

6. McGrath Aff. dated Oct. 30, 1970, p. 9.

carry books and magazines to each floor at least once a week, as damage to the library caused during the disturbances has not yet been repaired. The New York Lawyers Committee for Civil Rights Under the Law is planning to make efforts to obtain law books to supplement the libraries in all of the city's correctional institutions, including the Tombs. The Junior League has made an initial grant of $1,400 to the Department of Correction for the purchase of library books.

Similarly, with sick calls at the 12th floor clinic temporarily, but indefinitely, suspended, medical services are provided at the cells, with doctors going from floor to floor each day and evening. Two doctors are on duty at all times. One or two additional physicians are on duty during the day. Volunteer physicians are being recruited. Five such volunteers are presently at work, with three more expected soon. Appropriate adjustments are to be made in the clinic hours to accommodate the schedules of these physicians. A methadone program for heroin addicts, which was interrupted by the disturbances, has been reinstituted. This program has been inspected and evaluated by Dr. Vincent P. Dole, an expert in methadone treatment. Three nurses are on duty until 8:00 P.M., and one nurse is on duty in the evening. A dentist is on hand on weekday mornings; inmates requiring dental services are taken to his office on the 12th floor. Inmates requiring extensive medical examination or treatment are also taken to the 12th floor clinic.

As stated above, meals have been hampered by the destruction of furniture. However, an emergency contract has been awarded for the installation of new furniture on each housing floor, and tables and benches are soon to be installed to replace those destroyed. Food is now transported and kept warm by electrically-powered food carts. The Department of Correction has contracted to purchase 100 new and efficient food wagons at a cost of $1,000 each. In general, plastic utensils and paper plates are still being used. However, on January 25, 1971, one floor of the Tombs began using metal utensils, a practice which will be expanded as more equipment becomes available. Books and magazines are wheeled to the floors of the institution for use by inmates. The New York Times, the Daily News, El Dario, and the Amsterdam News are available in the commissary for purchase. There are TV sets on each prison tier, which may be viewed during lock-out periods. Radio programs are piped into the housing area up to 9:00 P.M. Two mobile motion picture projectors have been ordered to replace those destroyed. A contract has been let to repair the roof of the Tombs for use as an outdoor recreation area.

Inmates are now permitted to receive visitors two days a week—on Monday and Thursday for inmates whose names begin A through M; on Tuesday and Friday for the balance of the alphabet—and sentenced inmates working as help in the Tombs are permitted visitors once weekly, from 9:00 A.M. to 12:00 Noon on Saturdays. Attorneys may visit their clients from 9:00 A.M. to 7:00 P.M. on Wednesdays and from 9:00 A.M. to 4:00 P.M. on all other weekdays. The rules governing visitors were amended in July to widen the scope of persons who are permitted to visit inmates. See General Order No. 17, Rule 4.33. Hi-fidelity telephones are being installed in the visiting booths to improve communications between the inmate and his visitors. moreover, plans are now being made, in conjunction with the New York Telephone Company, for the installation of plug-in telephones, from which inmates will be permitted to make unmonitored calls, in every quadrant of the Tombs. Twenty-six such telephones are to be installed on or before April 5, 1971. Telephones have been installed in the Tombs receiving room and are available so that new inmates may make a free call anywhere in the New York metropolitan area. Many telephone calls have also been made during chaplain's visits, which are conducted in the attorney visiting room, where telephones are available.

The population of the Tombs is being kept under 1,400 inmates.[7] On December 16, 1970, there were 1,219 inmates in the Tombs. On December 31, 1970, the census of all correctional facilities in the city revealed 8,839 inmates, the lowest figure in five years, and at about the same time the population of the Tombs, at 1,182, was 128% of capacity. This total contrasts favorably with the total of 1,955 inmates held at the Tombs on August 6, 1970, which amounted to 210% of capacity. The Department of Correction recognizes that an ideal level of population would be about 80% capacity. We note, however, that the Department of Correction, which is under a court order to accept each individual referred to it for detention by the courts, has not been inactive in the face of rising numbers of criminal cases in which detention before trial is deemed necessary. A new building for men, on Riker's Island, is to open in March, with accommodations for 768 inmates. A Riker's Island facility for women, which will make available for men facilities now housing 450 women, at the Women's House of Detention in Greenwich Village, is underway. Also in progress is an Adolescent Remand Shelter on Rikers Island with a capacity of 1,080. The State Department of Correction has offered facilities in upstate institutions to house 3,272 inmates. The Branch Queens facility, which was destroyed during the riots in October, reopened January 26, 1971, with room for 194 inmates. A sum of $2.6 million has been appropriated to commence planning for a new detention facility to be known as Branch Manhattan. In all, the Department of Correction appears to have engaged in considerable activity designed to deal with the long-term, as well as the immediate, problems now confronting it.

Another way in which it has sought to respond is in the expansion and improvement of its staff. Three hundred correction officers were appointed between October and December 1970, and several important staff positions have been filled. A new program is underway, in conjunction with the Commonwealth of Puerto Rico office in New York City, for the recruitment and training of Spanish-speaking officers. The four to six-week program used for training all new correction officers is being revised, with an expansion of the teaching staff, and consideration is being given to the use of sensitivity training. The Urban League is presently engaged in planning improvements for this training program.

Finally, as we have noted, the Board of Correction has been revitalized by the appointment of a new chairman and members who constitute a cross-section of the city. The Board is working diligently to improve conditions in the Tombs. An investigation group established under its auspices is now functioning at the Tombs, reviewing grievances brought to its attention either by inmates or by relatives of inmates. In addition, the Department of Correction has granted permission to the New York Civil Liberties Union to screen all inmate complaints which it receives. Inmates at the Tombs may also voice their complaints by use of "interview boxes." These boxes, which are locked and which only the deputy warden may open, are available for inmates who wish to express written grievances. Approximately 20 slips are processed daily.

■■■ The definition of cruel and unusual punishment which is proscribed by the Eighth Amendment is far from clear. The concept is a flexible one, Weems v.

7. "28. We are attempting to keep the institutional census at a maximum of 1,400 inmates. We are accepting no inmates which would make the population exceed 1,400. At the time of the disturbances in August, the inmate population averaged about 1,900 daily. We have been able to successfully reduce the inmate population so that on October 29, 1970 it was 1,331. We have transferred from Rikers Island a significant number of sentenced inmates to state institutions thereby providing space for detention inmates many of whom previously used the Branch Queens facility which was destroyed during the October riots." (McGrath Aff. dated Oct. 30, 1970, p. 12)

United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), drawing its meaning "from evolving standards of decency that mark the progress of a maturing society," Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). The test is not whether the punishment is confining or unpleasant. Judged by such a standard few prisons would pass muster. Nor should the governing principle, in the case of prison conditions, be whether they conform to acceptable principles of penology. In a world of rapidly changing philosophies as to the functions and purposes of imprisonment, standards of penology are also changing. The essential yardstick for our purposes is whether the prison conditions go beyond what is necessary for protection of the public against the inmates and sink into the dismal area of man's inhumanity to man. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). The issue can be resolved only by our thoroughly scrutinizing the totality of the facts alleged to constitute an Eighth Amendment violation. For that reason we have set forth at length the preceding account of conditions at the Tombs as they appear from the various affidavits.

▆ After reviewing the above facts and considering all of the circumstances, we do not believe that plaintiffs have made a sufficient showing that they will successfully prove at trial that their confinement under present conditions constitutes cruel and unusual punishment to entitle them to preliminary injunctive relief. Clairol, Inc. v. Gillette Co., 389 F. 2d 264 (2d Cir. 1968); Societe Comptoir de L'Industrie, etc. v. Alexander's Department Stores, Inc., 299 F.2d 33 (2d Cir. 1962). We believe that most responsible officials and authorities involved would agree that existing conditions in the Tombs are far from satisfactory, and that every effort must be made to improve them. However, they have not descended (and, we hope, will not descend) to a level proscribed by the Eighth Amendment. This is not a case of confinement under extreme conditions such as the absence of clothing, heat, light, bedding, adequate food, and so forth, cf. Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966). See Teletype Orders No. 18–0, dated January 14, 1971, ordering discontinuance of the use of restricted diet as punishment. As part of the repairs being undertaken in the wake of the disturbances, a new lighting system for the housing areas in the Tombs is being designed by a consulting firm. The new system will substantially increase the amount of lighting available. Also, new paint is being applied, in pastel colors, and transparent window panels are being installed throughout the institution. Nor is there any statement in plaintiffs' affidavits concerning physical brutality or corporal punishment inflicted either by the guards, Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), or by other inmates, Holt v. Sarver, 300 F. Supp. 825 (E.D.Ark.1969).

In short, the conditions here, while not to be condoned, are not sufficiently offensive or severe to reach the level of cruel and inhuman punishment within the meaning of the Eighth Amendment. Similar complaints regarding such items as food, Holt v. Sarver, *supra* at 832; medical treatment, United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. (1970); Church v. Hegstrom, 416 F.2d 449 (2d Cir. 1969); Peek v. Ciccone, 288 F.Supp. 329 (W.D.Mo.1968); Faught v. Ciccone, 283 F.Supp. 76 (W.D.Mo.1966); and lack of access to legal materials (provided that the inmate is not prevented from communicating freely with courts or counsel), cf. Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961), cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L. Ed.2d 59 (1961); Roberts v. Pepersack, 256 F.Supp. 415, 433–434 (D.Md.1966), have been held not to give rise to claims under the Eighth Amendment. In regard to *pro se* legal work it is significant that Rule 4.18C, adopted July 1, 1970, provides that inmates shall be permitted to prepare legal documents and that indigent inmates shall be furnished with-

out charge writing paper, envelopes and postage for preparation and mailing of legal documents.

■ We think the present situation can aptly be characterized as one in which the inmates' confinément, already disagreeable because of overcrowding, has been made more difficult and offensive because of physical damages and heightened tensions caused by some of their own fellow-prisoners. This presents an unfortunate state of affairs in which the correction administration is seeking to restore a modicum of normal operations to the Tombs. We do not overlook the fact that many of the inmates of the Tombs are awaiting trial and have not been convicted of any crime. They are of course entitled to Eighth Amendment protection as much if not more than convicted inmates, In re Birdsong, 39 F. 599 (S.D.Ga.1899) (chaining by the neck of unruly federal prisoner awaiting trial held cruel and unusual punishment; jailor fined $50 but imposition of fine suspended), and the fact that they have not been convicted of any crime may understandably aggravate the perceived severity of the deprivations which have been brought on by the disturbances. However, in view of the conscientious and concerned efforts being made by all state and city authorities involved to apply their expertise and available resources to betterment of the conditions we, in the exercise of our discretion, deny the motion for a preliminary injunction against cruel and unusual punishment, cf. Ex parte Pickens, 101 F.Supp. 285, 13 Alaska 477 (D.Alaska 1951) (overcrowding and dangerous conditions contested by federal prisoner awaiting trial; habeas corpus petition denied).

We turn finally to two additional claims raised by plaintiffs—the "censorship" of incoming mail, and the absence of prison rules. Plaintiffs base these claims on constitutional provisions other than the Eighth Amendment, while defendants do not argue that the challenged practices were necessitated by the inmate disruptions.

■ The first of these issues is the "censoring" of incoming mail for inmates. It is the practice at the Tombs to open all letters destined for inmates to ascertain whether they contain contraband [8] or money. The defendants allege that the letters are not censored, cf. Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970), or even read by the correction personnel who inspect them, and plaintiffs do not point to any specific instances in which it is contended that correspondence has been read, their general assumption being that if mail is opened for "inspection" of the contents for contraband the privacy of the correspondents is inevitably reduced even though the message is not read in every case.

Plaintiffs do not contest defendants' statement that there are no restrictions on outgoing mail which inmates wish to send: [9] letters are sealed by the inmate and not opened, and there is no limitation on the number of letters which may be sent, cf. Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965) (regulation limiting inmate to 12 correspondents upheld), or to whom they may be sent, cf. Peek v. Ciccone, 288 F.Supp. 329, 334 (W.D.Mo.1968).

Inspection of incoming mail has not been invalidated, or even directly considered, in any of the more recent cases which have come to our attention, though it is apparently a common prison practice, cf. Hatfield v. Bailleaux, 290 F.2d 632, 639 (9th Cir. 1961), cert. denied,

---

8. We are not informed as to what constitutes contraband but assume that it encompasses such things as razor blades, drugs, wire, lock-pickers, saw-blades, etc. See, however, the proposed regulations submitted by defendants, Point 6 ("Contraband"), which provides a definition but no specific examples.

9. Although Rule 4.18A provides in part that "all mail from or to inmates shall be carefully inspected for contraband," an experiment is underway at the Tombs whereby outgoing mail is not inspected.

368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961); Ortega v. Ragen, 216 F.2d 561 (7th Cir. 1954), cert. denied, 349 U.S. 940, 75 S.Ct. 786, 99 L.Ed. 1268 (1955). While Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), held that, under the facts of that case, censorship of mail and refusal to mail a letter of complaint violated the prisoner's right to communicate, the *Sostre* court did not find that all controls on the correspondence of inmates were constitutionally impermissible. On the basis of the affidavits submitted on behalf of both sides, we perceive no deprivation of constitutional rights in the general practice of opening incoming mail for purposes of inspection for contraband as represented to the court by the Commissioner.

In the particular situation before us, however, it appears that plaintiffs may have no adequate means of communicating with their counsel without the observation of the Department of Correction and its agents, the real defendants in the action. "Since the counsel room at the Tombs does not provide complete privacy, private correspondence might in some instances be preferable to personal interviews." Plaintiffs' Memorandum of Points and Authorities, pp. 11–12. We think it only fair, particularly when an inmate has sued the Commissioner who holds him in custody, that the inmate be afforded a full opportunity to confer or correspond with his attorneys in privacy and without observation, interference, or listening in by representatives of the Commissioner, the adverse party. The right to private consultation with legal counsel must be afforded to plaintiffs. Having in mind the equally important objective of furnishing this right to inmates in a manner that will not jeopardize the security of the prison, defendants may decide upon a means that is suitable and feasible. For example correction officials may permit counsel to meet with their clients in person without having correction personnel present or listening in, or, alternatively, they may desist from opening and inspecting mail received in envelopes bearing an attorney's letter-

head. Possibly some other method may be suggested.

For the foregoing reasons, an injunction will issue prohibiting defendants from interfering with private consultations between plaintiffs and their counsel in this and other cases in which the Commissioner of Correction, or his staff, are parties. This injunction shall not be construed to prevent the inspection (by opening) of incoming mail directed to inmates of the Tombs by their counsel provided other means are afforded them (e. g., *private* face-to-face consultations) for communicating in private.

We turn finally to the absence of rules governing the conduct of inmates and guards. Plaintiffs argue that such rules are essential to the conduct of the institution, that it is only fair that inmates have notice of what is expected of them and that correction officers be deterred from the arbitrary exercise of their powers. Defendants answer that rules written in English and Spanish are posted in the first floor receiving room, and that the inmates need be given no other notice of the rules.

On the issue of rules, we agree with plaintiffs. See Carothers v. Follette, *supra.* There should be a more complete set of rules, possibly including rules governing inmate behavior, lock-out times and procedures, use of commissary, chapel, medical service, and the other aspects of inmate life discussed above, published in both English and Spanish. The absence of such rules can result in a denial of procedural due process.

Defendants have furnished as an exhibit various regulations adopted by the Department of Correction governing the discipline of inmates by correction officers. These regulations set forth a procedure providing for reporting of infractions to a disciplinary officer or board and for a hearing at which the inmate has a full opportunity to present his case. If the hearing results in a finding that an infraction has occurred, punishment may be imposed ranging from reprimand to punitive segregation or solitary con-

finement. Records are to be kept of all such proceedings. See generally Rule 4.49.

The foregoing would suggest that a system providing inmates with fundamental due process is now in effect, although the present system still embodies the critical shortcoming that inadequate notice is given to inmates of what is expected of them. The Commissioner has stated in his affidavit that a booklet is being prepared in English and Spanish which is intended to provide such notice to inmates upon their arrival at the Tombs, and a copy of a draft of this booklet has been furnished to the court. Accordingly, we will order that the defendants adopt a comprehensive set of rules, submit them to us for our approval, and post them in locations to be approved by us, or otherwise make them fully available to all inmates. We leave open the question of whether the Commissioner's draft which has been submitted complies fully with the requirements of due process. Counsel for plaintiffs shall be given opportunity to comment on the draft or to submit such counter-proposals as they and their clients deem constitutionally required.

■ We deny plaintiffs' motion for a preliminary injunction against further overcrowding of the Tombs and against transferring plaintiffs to other institutions outside of the jurisdiction of the court on the grounds that no need has been shown for the former and that, the action having been declared a class action by Judge McLean, there is no need for the latter to protect the jurisdiction of the court.

■ In considering the motion by defendants to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, Rules 12(b) (1) and (6), F.R. C.P., we must view the allegations of the complaint in a light most favorable to plaintiffs. Diamond v. Pitchess, 411 F. 2d 565 (9th Cir. 1969); Kurzweg v. Hotel St. Regis Corp., 309 F.2d 746 (2d Cir. 1962); Dioguardi v. Durning, 139 F.2d

774 (2d Cir. 1944). While plaintiffs have not made a sufficient showing of probable success on the merits to warrant our granting preliminary injunctive relief on all the claims asserted in the complaint, when the allegations of the complaint are viewed in a light most favorable to plaintiffs, the motion to dismiss must be denied.

The foregoing shall constitute the court's findings of fact and conclusions of law as required by Rule 52(a), F.R. C.P.

Settle order, including proposed rules and provisions for posting of them that will assure full notice to each inmate.