George N. STROMAN, James W. Braddy, Individually and on behalf of those similarly situated

v.

Carl A. GRIFFIN, Individually and in his capacity as Sheriff of Chatham County, Georgia.

Johnny C. WILSON et al.

v.

Asa D. KELLEY, Jr., Director of the State Board of Corrections of Georgia, et al.

Bobby L. HILL, Applicant for Intervention

v.

Carl A. GRIFFIN, Sheriff of Chatham County, Georgia, and member of the Class of Sheriffs of the State of Georgia.

Civ. A. Nos. 2690, 2735.

United States District Court, S. D. Georgia, Savannah Division.

Aug. 18, 1971.

Bobby L. Hill, Savannah, Ga., for George N. Stroman and James W. Braddy.

Howard Moore, Jr., Atlanta, Ga., for Johnny C. Wilson and others.

Peter E. Rindskopf, Atlanta, Ga., for Bobby L. Hill.

Anton F. Solms, Jr., Savannah, Ga., for defendants.

## ORDER

LAWRENCE, Chief Judge.

In 1968 several inmates of certain prisons and jails brought a class action in the Northern District of Georgia seeking declaratory and injunctive relief in connection with the desegregation of all such institutions in this State. The defendants in the suit were the Director of the Board of Corrections of Georgia and several sheriffs, jailors and other penal officials.

The three-judge court convened in that case ordered "complete integration of all city and county jails, all county Public Works Camps, all state correctional institutions, and all juvenile facilities * * on or before January 1, 1969." See Wilson et al. v. Kelley et al., D.C., 294 F. Supp. 1005. The Court said that it was controlled by the decision in Lee, Commissioner of Corrections of Alabama et al. v. Washington et al., 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212. There the Supreme Court affirmed a three-judge court in Alabama which held unconstitutional the practice of arbitrarily segregating the races in state, county and city penal facilities. Three of the justices sought in a concurring opinion to make explicit what was only implicit in the Court's per curiam opinion. "This is that prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline and good order in prisons and jails." 390 U.S. at 334, 88 S. Ct. at 995.

In Wilson v. Kelley, *supra*, the three-judge court in Georgia quoted this language but qualified same by noting that this "exceptional right" exists "normally only after-the-fact and not before." The district court further pointed out that "the danger to security, discipline, and good order must presently exist and be apparent to justify any segregation." *ibid.*, 294 F.Supp. 1009.

The Sheriff of Chatham County, prison officials in the County and the jail were affected by the state-wide injunction. That fact was recognized. He and the Jailor, Luke H. Sims, testified at the hearing before me that the jail was fully integrated by January, 1969. The plaintiffs in No. 2690, Savannah Division, did not agree. In 1970 these two inmates brought a civil rights class action in this Court.[1] They complained that Sheriff Griffin pursues a policy of racial segregation at the jail in derogation of their federal constitutional rights, particularly in connection with segregation in respect to visitation days. Declaratory and injunctive relief is sought.

I held an evidentiary hearing a year ago. There was testimony that no hard and fast rule existed as to white and black visitation days although there is de facto segregation of visitors as a matter of custom. The "bull pen" on the first floor is separated by a wire partition with young whites assigned to one side and young blacks to the other. There was much fighting in the jail both racially and intra-racially and on such occasions the prisoners are separated by race. The prison population at that time was around 245. However, the number

---

1. Jurisdiction is founded on 28 U.S.C.A. § 1343 and 42 U.S.C.A. §§ 1981–1983.

of inmates fluctuates. In May, 1971, it was 130 black and 54 white, a total of 187. The proportion of Negroes to whites generally runs around 2½ to 1. On June 30, 1970, a day selected at random, there were 17 white and 21 black prisoners on the first floor; 50 whites and 25 blacks on the second and no whites and 79 blacks on the third floor.[2] The fourth floor which houses female prisoners had 9 blacks and 4 whites. The all-black composition of the third floor was explained on the theory of drug abuse among Negro inmates and instances of sexual molestation of whites by blacks.

There was evidence that the occupants of individual cells are either black or white. The staff of twenty-four is all-white. Appointments of deputy jailors are made from the Civil Service list and Negroes apparently do not apply for employment in the penal field. All of the "house men," the "bridge boys" and the "trusties" are black. Each such group is selected from among the inmates. The "house man" helps keep order on his floor; assists with the general cleanliness of the cell block; lines up inmates at mealtime, and assigns them to cells under the supervision of a Deputy. The "bridge boys" help in keeping the outside area of the cell blocks clean and carry food from the kitchen. The "trusties" transport supplies from trucks, clean up the offices and perform some other duties.

In November, 1970, I drafted a form of opinion and order but did not file same. Meanwhile, in October of that year Bobby L. Hill, attorney for plaintiffs in the action, sought leave to intervene in Wilson et al. v. Kelley et al. in the Northern District of Georgia. Hill had been incarcerated in the Chatham County jail in October, 1970, as a result of a twenty day sentence for contempt imposed in the Municipal Court of Savannah. I ordered him released pending his state appeal from the contempt sentence. His intervention was granted for the purpose of filing a petition seeking prosecution of Sheriff Griffin in the Northern District on criminal and civil contempt charges. On December 10, 1970, Judge Sidney O. Smith transferred the matter to the Southern District pursuant to 28 U.S.C.A. § 1404(a) for determination and ruling. Legislative duties of counsel delayed a hearing for three months.

On May 21, 1971, an evidentiary hearing was held focused on the contempt issue. At that time the prison population on the third floor was all-black. The jail authorities explained that when young whites are incarcerated there they are molested by blacks. It is estimated that about 20% of the prisoners are homosexuals. A seventeen and an eighteen-year-old white claimed that they were raped by Negroes. Blacks seldom molest blacks.

At the contempt hearing Sheriff Griffin testified that he was in the process of changing visitation procedures beginning June 1, 1971. Saturday was to be set aside for visitors to all male prisoners, white and black. Sunday was to be reserved for visitation to female prisoners. This change was accomplished but not without a full scale riot (not racially motivated) by prisoners who conceived that they were given less time for visitation than under the old system and who had other complaints about conditions in the jail. According to a newspaper interview with the Jailor, Mr. Sims, additional facilities are needed for separating "hard-core" prisoners from misdemeanants. He attributed the riot to the former class of inmates.

Much of the trouble results, in my opinion, from an outmoded jail, completely unadapted to present conditions and modern penal philosophy. "The new jail," reported the *Savannah Morning News* on March 20, 1887, has "117 cells in all, thirty-four on each of the first, second and third floors, and fifteen on the fourth floor. Stout grated doors

---

2. A grand jury committee reported in 1968 that "All three floors of the county jail are occupied by white and black inmates on an integrated basis."

close the entrance to the cells, which are 5 feet wide, 10 feet long and 9 feet high. The back of each cell has an iron grating, so that guards can see through." The jail was built to house 150 inmates.

Physically speaking, there has been, until recently, little change in the intervening eighty-four years. Time did bring one reform. According to the *Morning News* in 1887, "The first cell on the right on the second floor has a trapdoor in its bottom on which condemned criminals will stand to be executed." I will mention one other change that has occurred since the jail was built. When the present building was opened on January 5th, 1888, the *Morning News* reported that the prisoners who were transferred to it were "cheerful, evidently well pleased with the changes that will give them more room in which to breathe and pass the weary hours of imprisonment."

Recently an addition to the jail was completed. Twenty-four additional cells (and also showers) were added at the west side of the old building. Seven cells on each of the three floors house four prisoners and one cell on each houses six. The addition increases the jail capacity by 102, giving a total capacity of 252. The new cells are 13.8 feet wide with a depth of 9.8 feet.

While the addition eliminates overcrowding for the present, it is no more than a stop-gap measure. The jail remains an antiquated structure. Integration is the harder to maintain because of inadequacy of the facility. Sheriff Griffin is on record as requesting the County Commissioners in 1969 to implement the erection of a new jail that will accommodate 600 inmates. "This is a *must*," he said. The June, September and December Term, 1969, grand juries called for the erection of a new city and county jail.[3]

In fact, at the May Term that year the grand jury reported that it "strongly recommends that the Chatham County jail be condemned as unfit for human occupancy." Recently federal courts have rendered decisions holding that imprisonment in certain jails may amount to "cruel and unusual" punishment in violation of the Eighth Amendment. See Jones v. Wittenberg, D.C., 323 F.Supp. 93. In another case the Eighth Circuit Court of Appeals has ruled that the entire Arkansas prison system is unconstitutional. See Holt v. Sarver, 442 F.2d 304.

█ Incarceration in the Chatham County jail falls far short of amounting to cruel and unusual punishment. I recently inspected it. I have eaten the food served to prisoners at noon. While the jail will hardly make *Gourmet's* recommended list of restaurants, the fare is substantial and nutritious. In 1969 the Committee on Law Enforcement of a grand jury reported that the jail was clean and sanitary and stated that "the prisoners are fed a well-balanced meal three times per day and that the menu is changed every day." Epicures will probably disagree with that opinion. Mr. Bobby L. Hill who has had an opportunity for first-hand evaluation of the menu testified that the food at the jail was "fair to bad." All I can say is, *De gustibus non est disputandum.*

---

3. In Jones v. Wittenberg, 330 F.Supp. 707 a decision in which a federal district court in Ohio practically took over the operation of the county jail at Toledo, Judge Young observed: "The popular, and simplistic, idea is that the important source of the problems is the purely physical one, and that this is easily remedied. In other words, build a new jail, and everything will be neatly straightened out. There are two things wrong with this idea. The first, and most important, thing wrong is that the evidence clearly demonstrates that if a beautiful brand new jail were built, and operated the way the present jail is operated, there would be little improvement in the difficulties at first, and what improvement there was would very rapidly disappear. The second thing wrong is that in order to build a new jail, the public must provide additional funds * * * [U]ntil a majority of the voters of Lucas County become convinced * * * that there will be no new county jail." This is quoted from the remedial order which followed the first decision reported in 323 F.Supp. 93.

As to physical facilities, the fact remains that the Chatham County jail is outmoded. It is completely inadequate as a penal institution in the late twentieth century. There is no opportunity for inmates to take exercise. They can only look with "wistful eye at that little tent of blue which prisoners call the sky." Other lines from Wilde's "The Ballad of Reading Gaol" express a truth about the local jail and many others of our own day and time. They are:

"The vilest deeds like poison weeds
    Bloom well in prison air;
It is only what is good in man
    That wastes and withers there.
Pale anguish keeps the heavy gate,
    And the Warder is Dispair."

Two hundred and forty-two years ago a committee of the British House of Commons was appointed "to inquire into the State of Gaols of this Kingdom and report the same with their opinion thereupon." Perhaps what we need in Georgia is another James Edward Oglethorpe. He was chairman of the committee. I note in the *Savannah Morning News* of August 19, 1971, that a Jails Standards Study Committee of the Georgia Legislature recently visited the Chatham County jail and reported that the officials were "doing the best with what they've got."

■ I find there has been no deliberate segregation of prisoners independently of the problem at certain times of assuring discipline and order. A few weeks ago I paid an unannounced visit to the jail. All four floors of the jail were integrated as far as inmate assignment is concerned. There was no wire partition in the first-floor "bull pen." The assignment at times of blacks to the third floor, as I observed above, appears to be related to good order in the jail and, in my opinion, was consistent with the rule that "segregation for the limited purpose of avoiding imminent prison violence, is at the discretion of prison authorities." Rentfrow v. Carter, D.C., 296 F.Supp. 301, 303.

■ Being jailor of a jail built in the nineteenth century to effectuate nineteenth century concepts of punishment is no enviable job. "The association between men in correctional institutions is closer and more fraught with physical danger and psychological pressures than is almost any other kind of association between human beings." Edwards v. Sard, D.C., 250 F.Supp. 977, 981. "The operation of penal institutions is a highly specialized endeavor, and the sober judgment of experienced correctional personnel deserves the most careful consideration by the courts." Edwards v. Sard, *supra*. The judiciary will not interfere with prison administration and discipline except when there is clear abuse of discretion. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; Diehl v. Wainwright, 5 Cir., 419 F.2d 1309; Riley v. Rhay, 9 Cir., 407 F.2d 496; Krist v. Smith, D.C., 309 F.Supp. 497; Rentfrow v. Carter, *supra*, and Wilson v. Kelley, *supra*.

■ ■ The visitation day discrimination has been eradicated. Let me recur to the matter of the all-white staff and the all-black categories of trusties, bridge boys and house men. The fact that there are no Negroes on the staff does not, in and of itself, establish racial discrimination. The plaintiffs in this case, who have the burden of proof, have not shown a single instance of invidious motivation in hiring practices. Apparently, qualified blacks do not apply for jailor jobs. I gained the impression from the evidence that Sheriff Griffin would welcome competent Negro assistants. As far as trusties are concerned, the present situation amounts to discrimination in reverse, that is, preference of blacks over whites. The trustie status is sought by many inmates. So, too, is that of house men. Surely, there can be no complaint under the Fourteenth Amendment by the black plaintiffs that only Negroes are selected to perform that responsible function. Being a bridge boy is not a badge of meniality pinned on Negroes. Such work is sought by them. Attached to it are certain privileges. Incidentally, from what I saw, a good number of the white inmates are hardly capable of lifting heavy trays of food, much less arriving safely with them at destination.

Generally speaking, the Negro inmates are more capable (and more willing) to perform these tasks than are the white.

I hold that the defendant is not in contempt of the District Court for the Northern District of Georgia and the 1968 state-wide order. I find that at the present time there are no racially discriminatory practices in the Chatham County jail justifying further injunctive relief. Of course, the relief granted in the state-wide case still governs the operations of the prison and my ruling is not dispositive of future violations of the injunction granted in the Northern District in Wilson et al. v. Kelley et al.